

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA

_____

In the Matter of the Application of

HAUNTED FOREST LLC and
TRACY A. QUINN,

**VERIFIED
PETITION/COMPLAINT**

Petitioners/Plaintiffs,

For a Judgment pursuant to Article 78 of the CPLR

Index No. _____

-against-

TOWN OF WILSON, NY,
TOWN OF WILSON ZONING BOARD,

Respondents/Defendants.

_____

Petitioners/Plaintiffs Haunted Forest LLC (the "Haunted Forest") and Tracy A. Quinn

("Petitioner Quinn") (collectively, the "Petitioners"), by their attorneys Lippes Mathias LLP, as

and for its Verified Petition/Complaint against Respondents/Defendants the Town of Wilson, NY

(the "Town") and the Town of Wilson Zoning Board (the "Zoning Board") (collectively,

"Respondents"), alleges as follows:

## THE PARTIES

1.      Petitioner Quinn is an individual and owner of the property located at 2860 Beebe

Road, Newfane, NY 14172 (the "Farm").

2.      Petitioner Haunted Forest is a limited liability company organized under the laws

of the state of New York, with an address at 2874 Delaware Ave, Buffalo, NY 14217.

3.      Respondent Town is a municipal corporation of the State of New York, with an

address of 375 Lake Street, Wilson, NY 14172.

4.      Respondent Zoning Board is a duly elected municipal agency responsible for balancing individual property rights with the rights of the general public to a healthy, safe and orderly community.

## VENUE

5.      This proceeding in part challenges a municipality's failure to classify the Petitioners' application as exempt from the New York State Environmental Quality Review Act ("SEQRA") as a Type II action.  It further challenges the municipality's subsequent Positive Declaration under SEQRA, requiring Petitioners to have an environmental assessment performed on the Farm activities.

6.      This Court has jurisdiction over the proceeding/action pursuant to Article 78 of the New York Civil Practice Law and Rules (CPLR) and CPLR 3001.

7.      This Article 78 proceeding and declaratory judgment action involves final actions of Respondents that are ripe for judicial review.

8.      The Farm is located in the State of New York, County of Niagara.

9.      The Town is located in the State of New York, County of Niagara.

10.      Niagara County is the proper, and mandatory, venue pursuant to CPLR 503(a), 504(2), 506(b), and 509 because Petitioners are located in Niagara County, the Farm is located in Niagara County, and the challenged municipal actions were made in Niagara County by Respondents.

## BACKGROUND

11.      Petitioner Quinn is the sole owner of the Farm, a 37-acre property located in a rural zone within the Town.

2

12.    The property was initially utilized as a horse farm, but due to financial issues related to, among other things, the COVID-19 pandemic, the Farm operations were diversified and transitioned into a hybrid horse, tree and vegetable farm.

13.    The Farm has two barns, and no living quarters. It serves only as a farm.

14.    The Farm has horses and approximately 300 Christmas trees, five acres of corn, and one and a half acres of pumpkins.

15.    In 2021, Petitioner Quinn and the Haunted Forest had a business relationship in place to operate a family-friendly agritourism event on the Farm to raise money from ticket sales, sell farm produce, market and promote the Farm.

16.    The event featured a themed corn maze and hayride, and ran for eighteen days in the Fall.

17.    The first year of the agreement with the Haunted Forest was a success, providing Petitioner Quinn with much needed income, assisting her in selling produce, and marketing the Farm to the community.

18.    As the Haunted Forest grew in popularity, profits for Petitioner Quinn increased and for the first time since owning the property she started to make money.

19.    In 2023, the Haunted Forest offered Petitioner Quinn a five-year lease agreement for $20,000 per year. The lease agreement permitted the Haunted Forest to operate for 18 days per year on the Farm, but for obvious reasons could not be executed until the Zoning Board approved the activities.

20.    Locking in $100,000 of income to only lease out the Farm for eighteen days a year, while having the added ability to sell more produce and continue to market the Farm, was a great opportunity for Petitioner Quinn.

3

## THE NEIGHBORS OF THE FARM

21.     The Farm has four adjacent neighbors.

22.     Unlike Petitioner Quinn, the four neighbors all utilize their properties as dwelling places, and not as farms.

23.     Prior to the Haunted Forest first operating on the Farm, the neighbors were vocal about their disdain for farm-related activities, specifically the proposed concept of having a seasonal hayride and corn maze on the Farm.

24.     The neighbors utilized their personal connections with Town officials in attempts to prevent the Haunted Forest from promoting and marketing the Farm by operating a seasonal corn maze and hayride.

## RESPONDENT'S TARGETED AND
## RETALIATORY ACTIONS AGAINST PETITIONERS

25.     Prior to opening the hayride and corn maze in 2021, Petitioners were told by various residents of the Town that a new law was going to be enacted targeting the Haunted Forest and Petitioner Quinn.

26.     An owner of the Haunted Forest, Cory Quinn, began speaking out publicly against the Town, its officials, and the new law.

27.     Shortly thereafter, in July of 2021, a Town Hall meeting was held to address the newly proposed local law relating to Agritourism.

28.     Local farmers attended the meeting and expressed concerns and opposition to a law in a rural community that put restrictions on agriculture.

29.     The Town Supervisor, Doyle Phillips (the "Town Supervisor"), publicly assured everyone that the new law would be narrowly tailored so as not to affect any of their agricultural

4

Case 1:25-cv-01124-LJV-MJR Document 9-23 Filed 01/09/26 Page 6 of 26

operations, which included Agritourism activities such as U-picks, wineries, wedding venues, and camp sites.

30. On July 21, 2021, the Town enacted Local Law No. 4-2021, which amended Article IV, Section 127-11(D) – the local law listing activities that required issuance of a special use permit to include "hayrides, petting zoo, harvest festivals, and cornfield mazes that contribute to the production and marketing of crops, livestock or livestock products." *See* Town of Wilson Code Article 4, Section 127-11(D)(14).

31. The Haunted Forest had publicly advertised their upcoming opening of a corn maze and hayride on the Farm, which of course had horses and the intention to sell harvested crops.

32. The new local law clearly targeted the Petitioners.

33. Frustrated with the Town officials that were abusing their power and authority to target and retaliate against Petitioners, Cory Quinn continued to speak out publicly. He chastised the Town and its officials on social media for their "good old boys" network and began garnering support from community members who shared his concerns about the unethical, incestuous manner in which the Town operated.

34. While members of the community supported the Haunted Forest for standing up to the Town, Cory Quinn's public statements exacerbated the Town's targeting of Petitioners and led to costly retaliation.

## THE CONFLICTS OF INTEREST AND
## ETHICAL VIOLATIONS OF JOHN MOLEY

35. Petitioners abided by the new law and applied to the Zoning Board for a Special Use Permit.

36. One of the five Zoning Board members, John Moley, had clear conflicts of interest, yet refused to recuse himself from the decision-making process.

5

37.     John Moley was not only personal friends with the neighbors who were conspiring with Town officials against Petitioners, but one of the neighbors was a chief engineer at John Moley's company.

38.     John Moley had also publicly condemned Petitioners in the community.

39.     During the initial 2021 Zoning Board meeting, John Moley's negative comments illustrated his transparent disdain for Petitioners, and he fought to add burdensome restrictions to the proposed operations.

40.     Petitioners were granted the requested permit, but it was conditioned on several restrictions which included limitations on hours of operations, forcing the Haunted Forest to stop ticket sales by 9:30pm and close completely by 10:00pm.

### TOWN CODE ENFORCEMENT OFFICER, TRAVIS EVANS

41.     The initial restrictions placed on the Haunted Forest by the Zoning Board were the tip of the iceberg.

42.     The Haunted Forest operated for less than 100 total hours in 2021, and during that time the neighbors contacted law enforcement dozens of times.

43.     The neighbors' complaints, mostly relating to noise, were all found to be without merit.  No tickets or citations were issued, as the Petitioners did not violate a single law.

44.     Petitioners also complied with every aspect of their special use permit.

45.     Throughout 2021, the Town Code Enforcement Officer, Chris Jordan ("CEO Jordan"), was being pressured by Town officials and the neighbors to take unlawful action against Petitioners.

46.     CEO Jordan refused to target the Haunted Forest, citing his ethical obligations as a public servant.

6

Case 1:25-cv-01124-LJV-MJR Document 9-23 Filed 01/09/26 Page 8 of 26

47. In 2022, CEO Jordan was fired by the Town, presumably for his refusal to cooperate with unethical demands of other Town officials.

48. Shortly thereafter, the Town hired Travis Evans ("CEO Evans") to replace CEO Jordan.

49. CEO Evans was friends with some, if not all, of the Farm's neighbors and the Town officials that had been targeting Petitioners.

50. On September 15, 2022, the week the Haunted Forest was set to open, CEO Evans arrived at the Farm and threatened to call the Niagara County Sheriff because the Haunted Forest's insurance policy was $1,000,000 of coverage and not $2,000,000 – one of the arbitrary requirements that the Town had put on the Haunted Forest that other business owners in the community were not required to adhere to.

51. Despite CEO Evans resorting to criminal threats as opposed to providing written notice to the Petitioners of the purported issue in a reasonable manner that would comply with basic, minimum standards set forth in the Constitution and in New York State law, Petitioners immediately paid the additional costs to increase their coverage and provided evidence of the adjustment the next day.

52. For the entire 2022 season, CEO Evans monitored the Haunted Forest from the neighbors' property every night of operations – despite this task falling far outside the normal duties of a code enforcement officer.

53. The Haunted Forest operated for less than 100 total hours during the fall of 2022, and CEO Evans was present the entire time.

54. Most evenings, CEO Evans remained on the neighbors' property well after the Haunted Forest shutdown.

7

55.     CEO Evans took pictures of customers of the Haunted Forest and was even seen hiding in the neighbor's bushes eavesdropping on private conversations between the Haunted Forest owners and employees after hours of operations.

56.     Customers of the Haunted Forest complained that CEO Evans made them uncomfortable, and one customer left a 1-star negative Google review referencing someone taking pictures of him in the parking lot.

57.     In addition to his constant surveillance of the Farm, CEO Evans was going around Town speaking out against the Haunted Forest. Among the people CEO Evans approached admonishing the Haunted Forest was Petitioner Quinn's elderly father.

58.     The Town's Supervisor, Doyle Phillips, and the Town's attorney, Kyle Andrews, were both noticed in writing on several occasions of CEO Evans' inappropriate conduct.

59.     Petitioners' attorney, Justin J. Andreozzi ("Attorney Andreozzi"), asked the Town Supervisor whether CEO Evans was monitoring Petitioners every night pursuant to orders by the Town, or if he was doing so independently as a friend of the neighbors.

60.     The Town Supervisor confirmed that CEO Evans had been directed by the Town to monitor the Haunted Forest during all hours of operations.

### THE TOWN'S INTENTIONAL DELAY TACTICS

61.     The Haunted Forest takes substantial planning and upfront financial commitments to set up for and coordinate the seasonal event. To ensure there was enough time to finalize the lease agreement and prepare for the event, Petitioners applied for their 2023 permit in December of 2022.

62.     Attorney Andreozzi mailed Petitioners' application to the Town Clerk along with a check for the application fee on December 15, 2022.

8

63.    SEQRA requires that an agency determines whether the action is Type I, Type II, or an Unlisted Action "as soon as an agency receives an application". *See 6 NYCRR Sec. 617.6(a)(1)*.

64.    Petitioners had submitted applications for a special use permit in each of the two prior years, and on both occasions SEQR did not apply as the action was clearly Type II as it was agricultural in nature.

65.    On January 4, 2023, having not received notice of the date and time of the meeting, Attorney Andreozzi sent follow-up correspondence to the Town to confirm receipt.

66.    On January 18, 2023, Attorney Andreozzi emailed the Town's attorney a PDF of the application and check that had been mailed out over a month prior.

67.    Without notice or warning, just before the Zoning Board was set to meet, Petitioner's application was pulled from the agenda.

68.    Petitioners were advised that the application was pulled by the Town Clerk at the request of the property owner, and that the Town Clerk verified with the Niagara County clerk who the property owner was.

69.    Petitioners knew this could not have been true, as Petitioner Quinn was the sole property owner and certainly did not request that the application be pulled from the agenda.

70.    After further investigation, Petitioners were notified that it was CEO Evans who pulled the application.

71.    No explanation was provided as to why the Town initially lied, or as to why CEO Evans erroneously pulled the application, but it was clear that it was done to further damage Petitioners.

9

72. Attorney Andreozzi notified the Town that time was of the essence, so Petitioners needed to be immediately calendared for the next Zoning Board meeting.

73. Despite multiple attempts to be heard, the Town continued to delay and create frivolous excuses, resulting in several months of additional delays.

74. On April 26, 2023, the day of the April 2023 Zoning Board meeting, Attorney Andreozzi was notified for the first time that Petitioners were on the agenda.

75. Petitioner Quinn was unable to attend the meeting, as she was with her husband who had just had surgery due to physical issues stemming from the stress and anxiety of the Town's and neighbors' misconduct.

76. Attorney Andreozzi was able to attend the meeting, accompanied by one of the owners of the Haunted Forest.

77. The Zoning Board had still not provided any notice that the Haunted Forest had been classified as a Type I action, and that there were potential environmental concerns.

78. John Moley was not present at the Zoning Board meeting.

79. It was believed that he finally recused himself due to his clear conflict of interest.

80. At the conclusion of the meeting, just before the Zoning Board members were preparing to vote on Petitioner's application, CEO Evans interrupted the meeting claiming that the owner of the Farm, Petitioner Quinn, had personally requested that the application for a special use permit not be considered.

81. CEO Evans stated on the record at the meeting that Petitioner Quinn told him that day in his office that she wanted nothing to do with the Haunted Forest, and thus did not need the special use permit.

10

82.     Attorney Andreozzi, knowing that this could not have been true, challenged CEO Evans.

83.     CEO Evans stated that he had the entire conversation on video.

84.     Based on the statements from CEO Evans, the Zoning Board adjourned the meeting without a vote.

85.     Petitioner Quinn was notified of CEO Evans' misrepresentations at the meeting and immediately denied them.

86.     Petitioners requested a copy of the alleged video for the Town's attorney, but it was never provided.

87.     The Town later published the minutes from the meeting, which entirely misrepresented what had occurred.

88.     The published meeting minutes made no reference to CEO Evans at all and misrepresented the reason for the adjournment.

89.     On May 4, 2023, it was finally admitted that CEO Evans did not have the purported video, and in fact never even spoke with Petitioner Quinn.

90.     Petitioners demanded to be heard at the May 2023 Zoning Board meeting and advised the Town that Petitioner Quinn and the owners of the Haunted Forest would personally attend the meeting to dispel any further misrepresentations and delay tactics.

91.     Five months had elapsed since Petitioners submitted their application for a special use permit, and the Zoning Board had still not made a determination.

92.      Petitioners had incurred substantial damages due to the issues and delays, but if a determination was not made at the next meeting, they would be forced to cancel the event for 2023.

11

Case 1:25-cv-01124-LJV-MJR    Document 9-23    Filed 01/09/26    Page 13 of 26

## TOWN ZONING BOARD'S ABUSE OF DISCRETION
## AND ARBITRARY AND CAPRICIOUS DECISION

93.     The May 2023 Town Zoning Board meeting was the last chance to get approval in time for Petitioners to execute their agreement and run the event.

94.     John Moley, who was absent at the last meeting that was derailed by CEO Evans just before the application went to vote, attended the meeting as a voting member of the Zoning Board.

95.     Contrary to Petitioner's belief, John Moley had not recused himself for the conflicts of interest and ethical violations, and apparently had simply been unable to attend the April 2023 meeting that was adjourned prior to a vote due to CEO Evans' misrepresentations.

96.     Members from across the community who could not attend the meeting sent letters to the Zoning Board, and several more appeared on behalf of the Haunted Forest to speak positively about the community event and dispel the false accusations of the neighbors.

97.     Petitioner Quinn spoke emotionally about the unforeseeable circumstances outside her control that created financial hardship, and how important the Haunted Forest is to financially sustain her Farm.

98.     When it became time for the Town Zoning Board to deliberate, John Moley – the only Zoning Board member who had not completed the required SEQR training -- began raising environmental and traffic concerns.

99.     The Zoning Board proceeded to SEQR, again skipping over the initial step of classifying the action   a step that by law should have been done as soon as the Zoning Board received the application back in December of 2022.

100.    The Zoning Boards failure to timely classify the action should have been a moot error, because a corn maze and hayride objectively constitute agricultural activities, which are

12

Type II actions. Moreover, even if the activity was erroneously classified as an Unlisted Action, it could not reasonably be concluded that a hayride and corn maze pose a significant threat to the environment.

101. The Town's own local law identifies corn mazes, hayrides, petting zoos, and harvest festivals as agricultural activities.

102. The NYS Department of Agriculture and Markets has also predetermined agricultural activities to be Type II SEQR actions that do *not* significantly affect the environment.

103. The Zoning Board cannot skip over the initial step of classifying the action, and therefore abused its discretion in doing so.

104. After skipping over the step of classifying the action, or at best erroneously classifying the action, the Zoning Board went on to independently determine whether the corn maze and hayride pose a significant impact on the environment.

105. Other Zoning Board members incredulously asked John Moley how a corn maze and hayride that operates 18 days a year could cause significant environmental issues.

106. John Moley erroneously convinced the board members that they needed to consider the environmental impact as if the event operated 365 days a year.

107. He then transitioned the discussion to increased traffic in the area, continuing to evaluate the change as if it were occurring 365 days a year. In doing so, John Moley erroneously convinced the Zoning Board members that the proposed action would have a significant impact on the character and quality of the community, the intensity of the land use, and the existing infrastructure for mass transit.

108. The Zoning Board subsequently made a final determination requiring Petitioners to complete an expensive, prolonged environmental assessment.

13

109. The Zoning Board refused to vote on the issuance of the special use permit, even conditionally, until completion of the environmental assessment, and concluded the meeting.

110. The final determination was arbitrary and capricious.

## THE FINAL DETERMINATION WAS ANOTHER TARGETED, MALICIOUS, RETALIATORY ACTION AGAINST PETITIONERS

111. Respondents' issuance of a positive declaration not only made no logical sense, but was effectively a denial of Petitioners' request as it left them without the time nor the funds to hire a company to perform an environmental assessment on the property.

112. Minutes after the meeting, the neighbor that had caused substantial issues for the Petitioners for years and made misrepresentations at several Zoning Board meetings was seen and heard joking and laughing with John Moley about the disposition of Petitioner Quinn and the Haunted Forest.

113. The neighbor John Moley was laughing and joking with immediately following the meeting is the same neighbor that is a chief engineer at John Moley's company.

114. Shortly after the meeting, the Haunted Forest was forced to close operations.

115. Petitioner Quinn and the Haunted Forest both suffered substantial economic loss.

116. Petitioner Quinn's husband, Steven Quinn, continues to deal with the health issues that arose from the stress and anxiety stemming from this matter to date.

## FIRST CAUSE OF ACTION
### (SEQRA, Type II Exemption, Pursuant to CPLR Article 78)

117. Petitioners incorporate by reference all prior allegations set forth herein.

118. Section 617.5(a) of SEQRA regulations states that: "Actions or classes of actions identified in subdivision (c) of this section are *not subject to review* under this Part. These actions have been determined *not to have a significant impact on the environment* or are otherwise

14

Case 1:25-cv-01124-LJV-MJR   Document 9-23   Filed 01/09/26   Page 16 of 26

*precluded from environmental review* under Environmental Conservation Law, Article 8. The actions identified in subdivision (c) of this section apply to *all agencies.*" (Emphasis added).

119.   The actions specified in Petitioners' application for a special use permit are a hayride and corn maze.   These are agricultural activities that are listed as "Type II" under several subdivisions of Section 617.5(c) of SEQRA regulations.

120.   Subdivision 617.5(c)(4) specifically includes agricultural farm management practices consistent with generally accepted principles of farming.

121.   Moreover, Agriculture and Markets regulation Section 362.3(a)(4) states that promotional events and marketing assistance to agriculture are Type II actions as defined by Section 617.12 of Title 6, and "do not have significant effect upon the environment within the meaning of SEQR."

122.   Based on the foregoing, Petitioners' application for a special use permit to operate a corn maze and hayride constitutes a Type II action exempt from SEQRA.

123.   Petitioners are entitled to an order and judgment reversing the Town's SEQRA Resolution, declaring Petitioners' operation of a hayride and corn maze to be a Type II action exempt from SEQRA by operation of law, and awarding Petitioners' reasonable damages.

### SECOND CAUSE OF ACTION
**(SEQRA Violations and Arbitrary and Capricious Determinations
Pursuant to CPLR Article 78)**

124.   Petitioners incorporate by reference all prior allegations set forth herein.

125.   To the extent SEQRA applies to Petitioners' application for a special use permit, Respondents' determination that the action poses a significant environmental impact pursuant to the criteria set forth in Section 617.7 of SEQRA was unsupported by the record, arbitrary and

15

Case 1:25-cv-01124-LJV-MJR   Document 9-23   Filed 01/09/26   Page 17 of 26

capricious, and in all respects improper, in violation of SEQRA and an abuse of municipal authority reserved under state law.

126. To the extent SEQRA applies to Petitioners' application for a special use permit, Respondents' determination that the action posed "at least one significant adverse environmental impact" pursuant to the criteria set forth in Section 617.7(a)(1) of SEQRA was unsupported by the record, arbitrary and capricious, and in all respects improper, in violation of SEQRA and an abuse of municipal authority reserved under state law.

127. To the extent SEQRA applies to Petitioners' application for a special use permit, Respondents failed to "thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant impact on the environment" pursuant to Section 617.7(b)(3) of SEQRA, rendering its determination arbitrary and capricious, and in all respects improper, in violation of SEQRA and an abuse of municipal authority reserved under state law.

128. To the extent SEQRA applies to Petitioners' application for a special use permit, Respondents failed to "set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation" pursuant to Section 617.7(b)(4) of SEQRA, rendering its determination arbitrary and capricious, and in all respects improper, in violation of SEQRA and an abuse of municipal authority reserved under state law.

129. To the extent SEQRA applies to Petitioners' application for a special use permit, Respondents' determination, made over five months after the application was submitted, to require Petitioners to prepare an EIS violates the requirements set forth in Section 617.6(a)(1) of SEQRA, is arbitrary and capricious, and is in all respects improper, in violation of SEQRA and an abuse of municipal authority reserved under state law.

16

130. Petitioners are entitled to an order and judgment reversing the positive declaration in the Town's SEQRA Resolution and awarding Petitioners damages resulting from the arbitrary and capricious determination.

### THIRD CAUSE OF ACTION
### (Ultra Vires Action in violation of CPLR 7803(2))

131. Petitioners incorporate by reference all prior allegations set forth herein.

132. Chapter 67 of the Town's Code designates the Wilson Town Board as the lead agency under SEQRA in connection with application for permits.

133. Chapter 67 Section 21 of the Town's Code provides: "The Town Board may delegate the authority and jurisdiction of implementing this chapter to any appropriate department, board, commission, officer or employee as may be determined by resolution of the Town Board."

134. The Zoning Board, on May 24, 2023, declared itself as the lead agency under SEQRA for the purposes of reviewing Petitioners' application for a special use permit.

135. Upon information and belief, the Town of Wilson Town Board never delegated such authority to the Zoning Board.

136. Therefore, the positive declaration issued by the Zoning Board should be deemed null and void pursuant to CPLR 7803(2), because the actions taken by the Zoning Board were without or in excess of jurisdiction.

137. Petitioners are entitled to an order and judgment rejecting Respondents' positive declaration, and awarding Petitioners damages resulting from Respondents' intentional or reckless action in excess of jurisdiction.

### FOURTH CAUSE OF ACTION
### (Tortious Interference with Business Relations)

138. Petitioners incorporate by reference all prior allegations set forth herein.

17

Case 1:25-cv-01124-LJV-MJR    Document 9-23    Filed 01/09/26    Page 19 of 26

139.    Petitioners were engaged in a business relationship in which Petitioner Tracy A. Quinn agreed to lease the Farm to Petitioner Haunted Forest for 18 days a year in the fall to operate a for-profit agricultural event that generated income and promoted and marketed the Farm.

140.    Respondents had intimate knowledge of the existing business relationship and intentionally interfered with it.

141.    Respondents' actions were motivated by malice or otherwise constituted illegal means.

142.    Respondents' interference caused injury to Petitioners' business relationship.

143.    Petitioners are entitled to an order and judgment awarding Petitioners damages resulting from Respondents' tortious interference.

## FIFTH CAUSE OF ACTION
### (SEQRA, Timing of Classification, Pursuant to CPLR Article 78)

144.    Petitioners incorporate by reference all prior allegations set forth herein.

145.    Section 617.6(a)(1) of SEQRA regulations requires that "as early as possible in an agency's formulation of an action it proposes to undertake, or as soon as an agency receives an application…" an agency determine whether the action is a Type I, Type II, or an Unlisted Action.

146.    Petitioners submitted their application for a special use permit on December 15, 2022.

147.    To the extent that Respondents classified the action at all, it was not until more than five months after the application was submitted.

148.    Petitioners are entitled to an order and judgment reversing the Town's SEQRA Resolution, and awarding Petitioners' damages resulting from the delay.

18

## SIXTH CAUSE OF ACTION
### (42 U.S.C. § 1983 and Fifth and Fourteenth Amendments to the United States Constitution and Similar provisions of the New York State Constitution)

149.    Petitioners incorporate by reference all prior allegations set forth herein.

150.    Petitioner Quinn has a constitutionally protected property interest in her ownership of the Farm.

151.    Respondents acted unlawfully and under color of State Law to deprive Petitioner Quinn of her vested property interest and rights as provided in the *Fifth and Fourteenth Amendments to the United States Constitution*; 42 U.S.C. § 1983, and comparable provisions in the New York State Constitution.

152.    Respondents denied Petitioner Quinn of full use and enjoyment of her property without due process in violation of the *Fourteenth Amendments to the United States Constitution* by unlawfully removing her from multiple Zoning Board agendas, refusing to address her application in a timely manner, and unlawfully requiring an unduly burdensome environmental assessment be done in lieu of providing her with due process.

153.    Each and all of the acts of the Respondents alleged herein regarding the violations of Petitioner's due process rights were done by the Respondents, acting as state actors under the color of law.

154.    Respondents' actions were without legal justification and were motivated entirely by political concerns.

155.    Respondents' actions were intentional, wanton, malicious, egregious, and/or oppressive, thus entitling Petitioner to an award of punitive damages.

19

156. As a result of the foregoing, the Petitioners have been damaged and continue to be damaged in an amount to be determined at or before the trial of this action, including an award of punitive damages and attorneys' fees pursuant to 42 U.S.C. § 1988.

## SEVENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 and Fifth and Fourteenth Amendments to the United States Constitution and Similar provisions of the New York State Constitution)

157. Petitioners incorporate by reference all prior allegations set forth herein.

158. Respondents' actions unlawfully singled out Petitioners for punitive measures that are not taken against similarly situated persons or entities.

159. Respondents' actions are based on impermissible considerations and policy, as described above, and malice and bad faith, and with an intent to inhibit or punish Petitioners' exercise of their constitutional rights.

160. Respondents' actions are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees of the New York State Constitution by denying plaintiffs' Constitutional right to equal protection of the laws; 42 U.S.C. § 1983.

## EIGHTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – First Amendment Retaliation to the United States Constitution and Similar provisions of the New York State Constitution)

161. Petitioners incorporate by reference all prior allegations set forth herein.

162. Petitioners' rights have been violated under the First Amendment of the United States Constitution made applicable to the states via the Fourteenth Amendment to 42 U.S.C. § 1983, in that Petitioners were retaliated against by the Respondents for exercising their right to free speech in speaking out on matters of public concern.

20

Case 1:25-cv-01124-LJV-MJR    Document 9-23    Filed 01/09/26    Page 22 of 26

163. The right to criticize, question, or complain to or about public officials and to seek administrative and judicial relief are protected by the First Amendment.

164. Respondents' acts of retaliation were causally related and motivated by Petitioners' exercise of their First Amendment Rights.

165. Respondents unlawfully removed Petitioners from multiple Zoning Board agendas, enacted local law unlawfully targeting Petitioners' Farm and business, harassed Petitioners, interfered with their business relationship, and unlawfully required an unduly burdensome environmental assessment in retaliation for Petitioners' exercise of the right to free speech in violation of the *First Amendment to the United States Constitution*; 42 U.S.C. § 1983 as well as comparable provisions in the New York State Constitution.

166. Each and all of the acts of Respondents alleged herein regarding the violations of Petitioners' First Amendment rights were done by Respondents, acting as state actors under the color of law.

167. As a proximate result of Respondents' intentional, willful, and/or reckless behavior, Petitioners have been unlawfully deprived of property rights, significant income, and have otherwise suffered damages.

## NINTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Conspiracy)

168. Petitioners incorporate by reference all prior allegations set forth herein.

169. Respondents' acts described above constitute a conspiracy carried out under the color of state law in violation of 42 U.S.C. § 1983 and constitute a violation of Petitioners' rights to free speech, equal protection, and due process under the *First, Fifth and Fourteenth Amendments to the United States Constitution.*

21

170. Beginning in or about 2021, Respondents conspired to retaliate against Petitioners for Petitioners' exercise of their right to free speech and to deprive Petitioner Quinn of her constitutionally protected property rights.

171. Respondents, through Town officials and employees including but not limited to CEO Evans, John Moley and Town Supervisor Doyle Phillips, conspired amongst themselves and with individual residents of the Town in retaliation for Petitioners' activities in challenging Respondents' improper, illegal, unauthorized and unethical conduct.

172. In furtherance of their agreement, the Town enacted a local law targeting Petitioners without a rational basis; CEO Evans monitored and harassed Petitioners during and after hours of operations on private property; the Town Clerk, and/or CEO Evans unlawfully removed Petitioners from the January 2023 Zoning Board agenda; Respondents intentionally evaded communications from Petitioners requesting to be heard and failed to provide timely due process; CEO Evans made fraudulent representations on the record at the May 2023 Zoning Board meeting to cause further delays; Respondents failed to timely classify the action pursuant to SEQRA regulations; John Moley and Respondent Zoning Board abused their discretion in determining that Petitioners' application constituted a Type I or Unlisted Action under SEQRA; John Moley conspired with residents of the Town to make misrepresentations publicly about Petitioners; and John Moley and Respondent Zoning Board rendered an arbitrary and capricious Positive Declaration requiring Petitioners to complete and unduly burdensome and inappropriate environmental assessment.

173. Petitioners suffered and continue to suffer from the Respondents' adverse actions as a result of their speech.

174. Due to Respondents' actions, Petitioners lost business opportunities; Petitioners have been embarrassed, humiliated, defamed, pecuniarily damaged and had their good names,

22

good will, and personal and business reputations tarnished, and Respondents' constitutional violations continue to cause Petitioners to suffer other damages and harm.

175. As a result of the foregoing, the Petitioners have been damaged and continue to be damaged in an amount to be determined at or before the trial of this action, including an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## TENTH CAUSE OF ACTION
### (Injury to Business Reputation)

176. Petitioners incorporate by reference all prior allegations set forth herein.

177. The aforesaid intentional and malicious acts by the Respondents have caused and will continue to cause substantial harm and injury to Petitioners.

178. Respondents have purposefully and maliciously engaged in a pattern of conduct to damage the reputation and good name of Petitioners.

179. As a result of the foregoing, the Petitioners have been damaged and continue to be damaged in an amount to be determined at or before the trial of this action, together with attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION
### (Declaratory and Injunctive Relief)

180. Petitioners incorporate by reference all prior allegations set forth herein.

181. Respondents' actions in continuously and intentionally delaying Petitioners' right to due process, willfully and erroneously requiring an unlawful and unduly burdensome environmental assessment, targeting Petitioners with a newly enacted local law, and retaliating against Petitioners' for exercising their *First Amendment* right to criticize, question, or complain to or about public officials, were unlawful and unwarranted, and said wrongs continue to cause injury and damage to Petitioners.

23

Case 1:25-cv-01124-LJV-MJR   Document 9-23   Filed 01/09/26   Page 25 of 26

182.   Unless enjoined by this Court, Respondents will continue to infringe on Petitioners' constitutionally protected rights and thereby cause irreparable injury, as damages alone cannot fully compensate Petitioners for the ensuing harm.  Respondents' continuing violations require injunctive relief.

183.   Petitioner is entitled to a declaratory judgment that it was entitled to operate a corn maze and hayride on the Farm, and that Respondents lacked legitimate basis for their effective denial.

**WHEREFORE**, Petitioners/Plaintiffs respectfully request the following:

A. A judicial determination that Petitioners' application for a special use permit to operate a corn maze and hayride involves Type II actions exempt from SEQRA;

B. A judicial determination rejecting and reversing Respondents' Positive Declaration;

C. An order directing Respondents to immediately grant Petitioner a special use permit for their application to operate a corn maze and hayride on the Farm;

D. Damages in an amount determined at trial, including but not limited to Petitioners' lost profits, consequential and compensatory damages, costs, expenses, attorneys' fees, and any further relief the Court deems just and proper.

Dated: September 22, 2023

**LIPPES MATHIAS LLP**
Attorneys for Petitioners/Plaintiffs
9145 Main Street
Clarence, NY 14031
(716) 565-1100

By: _____
Justin J. Andreozzi, Esq.

24

## VERIFICATION

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF NIAGARA    )

    Justin J. Andreozzi, Esq., being duly sworn, deposes and says:

    I am a Partner of Lippes Mathias LLP, attorneys for Tracy A. Quinn and Haunted Forest LLC, Petitioners/Plaintiffs in the above-captioned proceeding, which party is not in the County where my law firm maintains its office. This Verification is therefore being submitted pursuant to CPLR 3020(d)(3). I have read the annexed Verified Petition/Complaint, and the same is true to my knowledge, except as to those matters stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

                                                                     Justin J. Andreozzi, Esq.

Sworn to before me this
22nd day of September, 2023.

Notary Public

TIFFANY D. BELL
Reg. No. 02BE6338317
Notary Public State of New York
Qualified In Erie County
My Commission Expires March 7, 2024